BIRMINGHAM TRUST & SAVINGS CO., EXECUTOR, ESTATE OF I. F. YOUNG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7440.    Decided October 29, 1926.

The March 1, 1913, fair market value of shares of stock sold in 1921 determined.

*Lee C. Bradley, Jr., Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income tax for the year 1921 in the amount of $3,571.33. The question in issue is the March 1, 1913, fair market price or value of 94 shares of the stock of an Alabama corporation which were sold in January, 1921, at $250 per share.

## FINDINGS OF FACT.

The petitioner is the executor of the estate of I. F. Young, who died in November, 1923. The decedent and J. A. Vann were stockholders of the Young & Vann Supply Co., an Alabama corporation with its place of business in Birmingham. The corporation was organized in November, 1906, with a capital stock of $30,000. The decedent originally owned one-third of the capital stock and Vann owned one-sixth. By successive stock dividends the capital stock was increased until it was $100,000 on March 1, 1913, and $210,000 on January 28, 1921, the date when the shares of stock in question were sold. This capital stock of $210,000 was divided into 2,100 shares having a par value of $100 per share. From the date of organization until the date of sale no new capital was put into the business, and the increase in capital stock was solely by way of stock dividends. The decedent was closely associated with J. A. Vann in the conduct of this business from its organization until decedent's death. The corporation was engaged in the business of selling steam fitters' supplies, such as pipes, valves, packing, rubber hose, machine supplies, etc. Its principal customers were furnace companies and mining companies. Its principal business was in the mineral district of Birmingham, Gadsden, Sheffield, Anniston, and Montgomery. Since the organization of the business there have been no sales of the stock of the corporation, except to persons connected with the business. On January 31, 1912, a small number of shares in the aggregate were sold to several employees, the price being fixed by the book value at the end of the preceding year. There was a general understanding between Vann and the decedent that they would not sell the stock except to each other, the basis of the sale to be the book value of all of the assets, the value of which was to be fixed by an appraiser.

The population of Birmingham and the number of consumers in the territory served by this corporation largely increased from the date of organization to March 1, 1913. There was an increase in the size and number of mines in the Birmingham district, and also in coal and iron tonnage. Business conditions in the district were very much improved by the reported purchase of the stock of the Tennessee Coal Iron & Railroad Co. by the United States Steel Corporation during the year 1907. The population of Birmingham, as shown by the Federal censuses for the years 1900, 1910, and 1920, was as follows:

| | |
|---|---:|
| 1900 | 38, 415 |
| 1910 | 132, 685 |
| 1920 | 178, 806 |

The population of Jefferson County, in which Birmingham is situated and which composed a large part of the mineral district in which the petitioner did business, as shown by the same Federal censuses, was as follows:

1900 _____ 140,420
1910 _____ 226,476
1920 _____ 310,454

The Young & Vann Supply Co. negotiated a long-term lease beginning October 1, 1910, and ending September 30, 1930, on the property where it conducted its business. The lease was at a net rental of $5,000 per year and the property leased had valuable railroad connections.

The net income of the corporation, after all expenses were deducted, was as follows:

Dec. 1, 1906–Nov. 30, 1907 _____ $14,679.95
Dec. 1, 1907–Nov. 30, 1908 _____ 5,725.27
Dec. 1, 1908–Nov. 30, 1909 _____ 16,542.32
Dec. 1, 1909–Nov. 30, 1910 _____ 26,451.35
Dec. 1, 1910–Dec. 31, 1911 _____ 20,578.71
Calendar year 1912 _____ 50,299.18

Gross sales, less allowances and prepaid freight, were as follows:

Dec. 1, 1908–Nov. 30, 1909 _____ $283,073.10
Dec. 1, 1909–Nov. 30, 1910 _____ 398,190.21
Dec. 1, 1910–Dec. 31, 1911 _____ 436,307.03
Calendar year 1912 _____ 531,647.75
Month of January, 1913 _____ 58,407.77
Month of February, 1913 _____ 48,055.86

The balance sheets at November 30, 1910, and at December 31, 1911, 1912, and 1920, show the stockholders' interest in the corporation as follows:

| | Nov. 30, 1910. | Dec. 31, 1911. | Dec. 31, 1912. | Dec. 31, 1920. |
|---|---|---|---|---|
| Capital stock | $60,000.00 | $60,000.00 | $100,000.00 | $210,000.00 |
| Undivided profits | 25,298.40 | 40,764.22 | 26,764.22 | |
| Reserve for contingencies | | | 21,299.18 | |
| Surplus | | | | 304,213.00 |
| | 85,298.40 | 100,764.22 | 148,063.40 | 514,213.00 |

The price of the products handled by the Young & Vann Supply Co. began to fall in November and December, 1920, and continued to fall throughout the year 1921. The corporation suffered a very severe inventory loss in 1921.

In order to equalize the holdings between the decedent and Vann, the decedent in January, 1921, sold to Vann 94 shares of the capital stock of the corporation at $250 per share. At that time there were

outstanding 2,100 shares of capital stock. The sale price of $250 per share was substantially the book value of the stock at the date of sale. The book value of the capital stock at December 31, 1912, the nearest date to March 1, 1913, on which the book value of the capital stock can be determined, was $148,063.40, which, divided by 2,100 shares, gives a book value of $70.50 per share. The Commissioner determined a March 1, 1913, value of the 94 shares sold in January, 1921, of $73.12 per share, and the deficiency computed by the Commissioner is based upon a profit upon each share sold of the difference between $73.12 and $250.

Vann and the decedent organized the corporation and were largely responsible for its success. In order that the cash resources of the corporation might be conserved, they drew salaries which did not adequately compensate them for services rendered. During the early years of the corporation, Vann received a salary of $3,000 per year and the decedent a correspondingly low salary. The profits of the corporation from the date of organization to March 1, 1913, were approximately 33½ per cent on the average amount of capital invested.

The fair market price or value of each of the 94 shares of stock sold by the decedent in January, 1921, was $100 on March 1, 1913.

### OPINION.

SMITH: The Commissioner determined the March 1, 1913, fair market price or value of the shares of stock sold by the decedent in January, 1921, at $73.12 per share. This value is slightly in excess of the book value at the basic date. The petitioner contends that the value was much greater than that, but has left the exact amount for the determination of the Board. At the hearing the petitioner put on the stand an accountant who testified that in his opinion a prospective purchaser of the corporation of the Young & Vann Supply Co. in 1913 would have been justified in paying $275,000 or $300,000 for the assets of the business which, on December 31, 1912, had a book value, measured by capital stock, undivided profits, and reserve for contingencies, of $148,063.40. In his opinion a prospective purchaser could reasonably have expected profits of $30,000 a year from the business, and an industrial enterprise that was assured a return, year in and year out, of 10 per cent upon its capital investment was worth ten times the annual yield.

The evidence indicates that the success of the business was due in a very large part to the efforts of the decedent and Vann. They drew relatively small amounts as salaries during years prior to 1913. On cross-examination the witness Vann testified as follows:

Q. Do you think that had you and Mr. Young sold your stock in the corporation [in 1913] that the corporation could have carried on the business as successfully?

A. No, sir; we did not have the organization. We could not afford the organization to do that.

Q. What is that?

A. We could not afford—we did not have an organization that could do that. We were the executives. We did not have any men in our employ.

Q. Assuming you and Mr. Young had died on March 1, 1913, what would have happened to that business?

A. Well, that is problematical. I do not see hardly how it could have gone on. Of course it would have been sold out probably.

Q. What was your salary in 1906 from the Young & Vann Supply Company?

A. I have forgotten. I believe it was $250 per month.

\*     \*     \*     \*     \*     \*     \*

Q. Did you consider that you were taking out of the business sufficient compensation for the services rendered by you, or did you figure you were a stockholder and would share in the profits of the corporation, and only took out such funds as was necessary?

A. That is the way I considered it.

\*     \*     \*     \*     \*     \*     \*

Q. Mr. Young only took out such drawing account as he needed, and left the other to be taken in the nature of dividends?

A. In the nature of capital; we needed capital.

Q. You need capital in the business?

A. Yes.

Q. In other words, he did not consider he was drawing an amount from the corporation equal to the services which he rendered to the corporation?

A. We thought like we would get the benefit later.

We think that the sale of a few shares of stock at book value to certain employees of the corporation during the year 1912 is no indication of the "fair market price or value" of the shares on March 1, 1913. The circumstances under which the sales were made must be taken into consideration. *Walter* v. *Duffy*, 287 Fed. 41. In the absence of sales, we must look to other evidence of value. In a recent case, *Boyd* v. *Heiner*, 5 Am. Fed. Tax Rep. 6069, the District Court for the Western District of Pennsylvania stated:

Now, in determining the intrinsic value of this property, we must not confine ourselves to one factor in determining value, \* \* \*. We must necessarily look to every factor that would have any bearing whatever on the determination of that fact.

Likewise, in the instant case, we must look at all the factors bearing upon the value of the shares of stock. The corporation, Young & Vann Supply Co., was carrying on a profitable business in a mineral district where the demand for the products sold by the corporation was rapidly increasing. The sales of the corporation were mounting rapidly and the profits were correspondingly increasing. The name of the petitioner corporation was becoming known. The profits for the three-year period prior to 1913 were in excess of 25 per cent on the capital actually invested. We think that this warrants a conclusion that the shares of stock had a value in excess of the book value. It is to be noted, however, that

the corporation had no monopoly in its field. The principal officers were inadequately compensated for their services and the prosperity of the business depended to a large extent upon the activities of the decedent and Vann.

From a consideration of all of the factors, we are of the opinion that the fair value of the shares of stock on March 1, 1913, was in excess of the amount found by the Commissioner, and that the fair market price or value of each of the 94 shares of stock sold by the decedent in January, 1921, was, on the basic date, $100, which value was in excess of the cost to the decedent.

*Judgment will be entered on 15 days' notice, under Rule 50.*